1832.

COLT
v.
WILDER.

## COLT vs. WILDER and others.

A private debt, without the express assent of the creditor, may, by the understanding of partners, become payable out of partnership funds. Thus: B. a bookseller, was privately indebted to A. for money had and received. The former laid out the money in books and brought them as stock into a partnership formed with C. The concern became insolvent; and B. (during C's absence, but acting for him under a power) made an assignment for the benefit of their creditors and put down A. as a creditor of the concern. The court, considering there was proof of C's understanding, before the insolvency, that the debts which B. owed for books brought into the concern were to be paid out of the co-partnership funds: HELD, that A. was to be considered as a creditor of the firm, notwithstanding he had given no consent to be so considered, and was entitled to dividends under the assignment, with the rest of the partnership creditors.

*November* 20.
1832.

*Partnership.
Separate debt
and joint lia-
bility.*

IN the year one thousand eight hundred and twenty-three, the defendant Oshea Wilder was in London. He had funds in his hands belonging to the complainant amounting to one thousand five hundred dollars; and, determining to buy books and other articles forming a bookseller's assortment and to establish himself in such a business in New-York he expended the complainant's money in the purchase of books, and, at the same time, obtained credit with Sir Richard Philips and others in London to a much larger amount.

With the property thus obtained, he came to the city of New-York, in the month of September, one thousand eight hundred and twenty-three; and, began business.

Shortly afterwards, he entered into partnership with the defendant James M. Campbell in the book line in New York; and put in the stock which he had on hand, and other merchandize, by way of capital. This constituted almost the entire stock in trade of the partnership. Campbell brought in only

about one hundred dollars worth of stock belonging to himself and a considerable amount of books which he had in his hands for sale upon commission. Neither of the partners brought in any ready money. There was only a verbal agreement for copartnership; whereby it was understood that there should be an equal division of profit, while losses were to be borne equally.

They became insolvent; and, on the sixteenth day of September one thousand eight hundred and twenty-five, assigned their partnership property and effects to the defendant Mr. Smith W. Anderson, in trust for the creditors of the concern. At the time of the assignment, James M. Campbell was absent in Europe; and the deed of assignment was executed by the defendant Oshea Wilder for himself and as attorney for his copartner, Campbell, under a power which the latter had left with him.

In the schedule annexed to the assignment, the complainant was set down as a creditor of the firm to the amount of one thousand dollars. Upon the return of Campbell from Europe, he objected to the complainant's being considered such creditor; and insisted, that if Mr. Colt were a creditor at all, he was a creditor of Wilder's individually and not of the firm.

This led to the filing of the present bill. The complainant sought to be allowed a dividend from the property assigned, rateably with the other creditors of the copartnership. The bill charged, that, in the formation of the partnership, it was agreed between the two partners that the debts which had been contracted by the defendant Wilder should be assumed and paid by the copartnership or out of the partnership funds; and that it was understood, both by the partners and the complainant, during the continuance of the copartnership, that it was based and conducted upon such agreement.

The answers of Wilder and Campbell were read, by consent, as depositions in the cause and with the like effect as if the parties had been examined as witnesses. The defendant Wilder stated, that in consequence of the proposition to form the partnership, and which proposition came from Campbell,

·he had many unreserved ·conversations with him, in which he communicated how ·he, ·Wilder, had contracted debts in the purchase of the books· and looked entirely to the proceeds to enable him to pay them, having ·no other· property or means; and that such debts must, therefore, be paid out of the proceeds of the books or be assumed by the partnership. That this was repeatedly mentioned and perfectly understood by Campbell, who never made the slightest objection or expressed any dissatisfaction at such arrangement, and he, Wilder, would never have formed the partnership or thought of it for a moment on any other terms. That, as no difficulty or objection was made by Campbell respecting this condition, he, Wilder, may not have enumerated the debts or mentioned the names of the several creditors, but he believed he did, and, among the rest, *the name of the complainant as one of such creditors.* He did mention that the debts were incurred as well for monies of others expended in paying for some of the books as in the purchase of some on credit. This defendant concluded by saying, that the basis of the partnership was the distinct understanding between him and Campbell, that these debts were to be, paid out of the copartnership funds or to be assumed by the firm.

The defendant Campbell in his answer said, it was never agreed or understood, either directly or indirectly, between him and Wilder that any debt due by Wilder to Colt, the complainant, for books or any thing else, was to be assumed by the partnership; that, before the partnership was formed, he was not aware of Wilder's being indebted at all to Mr. Colt for any of the money with which the cash purchases had been made, and it was not until after the partnership was formed that he ever heard of such indebtedness; that Wilder never intimated a wish that this debt should be assumed, nor would he, Campbell, have permitted it: for this reason, because the most valuble of the stock bought with Colt's money had been previously sold by Wilder and he would have considered it an assumption of the old debts of Wilder, against which he felt cautious and on the alert. He denied all conversations with Wilder on

the subject of the debt to the complainant before the partnership was formed; and also, that in conversations afterwards between them, he averred he never admitted in any manner, either directly or indirectly, that the complainant was to be made a creditor of the partnership for any antecedent debt due by Wilder to him.

Mr. *Elijah Paine*, for the complainant, rested the case upon the following points:

I. The firm of Wilder and Campbell assumed the payment of such of Wilder's debts as were in any way incurred in the purchase of stock brought into the firm by him. An agreement, previous to the formation of the partnership between Wilder and Campbell to assume those debts and on which the partnership was based, is distinctly and repeatedly charged in the bill, is fully admitted by Wilder in his answer and proved by his evidence (the answer being agreed to be received as his deposition) and is also admitted by the studied silence of Campbell: who avoids answering the pointed statements and interragatories of the bill as to this all-important fact, but is very full in his answer to immaterial facts or facts not enquired about.

II. It was the course of partnership-dealings of the firm of Wilder and Campbell to assume and pay Wilder's debts for stock of his own brought into the firm. This is admitted by Campbell's answer; and proved by a witness. The assumption and payment of the complainant's debt during the partnership, would, therefore, have been in the usual course of the dealings of the partnership. An assignment of the partnership effects, when the firm became insolvent, to pay his debts is certainly no more than this. And this assignment being made by Wilder, acting for the concern in Campbell's absence under a power of attorney from Campbell and without any fraud or collusion with or even the knowledge of the complainant, is binding on the concern. It was made in the usual

course of the partnership dealings. It was dealing with the complainant as they had dealt with others.

III. There is no dispute that a considerable quantity of books bought with the complainant's money went into the joint concern. As to these, the law almost presumes that Campbell, having the benefit of them, agreed that the partnership obligation should be given for them and requires but slight circumstances to prove it. It is said, that it would not be unwholesome for a jury to infer largely that that obligation clearly according to conscience had been given upon an implied authority. But the proof of assumption in this case is not slight but abundant.

IV. But Wilder says, that he made an estimate, when he made the assignment of the books brought into the concern which were bought with the complainant's money, and that the amount was more than one thousand dollars. This estimate was made by the only one who had any accurate knowledge on the subject and while it was fresh in his mind. Long afterwards, Campbell and Hill (a witness), who both admit that they never had any means of knowing the amount, undertake to prove what it was and make it about one fifth of what Wilder estimated it. They both prove Wilder's ability and sole ability to tell what the amount was. It is evident that no person but Wilder can prove the amount, and it is, therefore, a fact proven in the case that the amount was one thousand dollars. But, if the amount is not to be considered as proven, a reference would be necessary.

V. Wilder is a disinterested and competent witness. The question is, shall this property go to pay Wilder's debt to the complainant or his debts to others? He is equally liable to all. His interest is, therefore, balanced. But it is said, he is interested to take the joint property of Wilder and Campbell to pay his separate debt. Not at all. Suppose it to be really his separate debt and that the joint property goes to pay it. He

and Campbell have yet to settle their joint accounts. In any suit between them for that purpose, the decree in this case could be used by neither. If the joint property has, in any instance, been applied, no matter how or when, to pay a separate debt of Wilder's, Campbell will be allowed the amount and Wilder must pay him. So that it is no matter to him whether his separate or joint creditors take this property.

VI. But Campbell is an interested witness. If Colt recovers in this case, although Campbell might afterwards call Wilder to an account and then show that it was in truth the separate debt of Wilder and be allowed for joint property which had gone to pay it, yet his remedy over would be against an insolvent (as is proved) and this, in law, is a sufficient interest to exclude him.

VII. Where there is an entire absence of fraud on the part of the purchaser, one partner may dispose of the partnership stock and the sale will be binding on the firm: *Gow on Partnership*, 73.: 2. *B. and A.* 673; 5, *H.* 395; *Cowp.* 445; 3, *J. R.* 68; 5. *Cranch*, 289; *Lloyd and Welsby*, 6. Here, it cannot be pretended there was any fraud on the part of Colt. Suppose he understood the state of things to be exactly as Campbell and Hill (the witness) represent them. Then, he knew that the firm had assumed and paid some of Wilder's individual debts; that Wilder had a power of attorney from Campbell; that he had himself delayed calling on Wilder or the firm, believing his debt also to be assumed. Was there any fraud then, either in Wilder or Colt, in making or receiving this assignment?

Mr. *Samuel G. Raymond*, for the defendants.

I. At law a partnership cannot be bound for the separate debt of a copartner (admitted to be such in its inception) without a written consent or contract by the firm that it shall become so.

II. In equity, a firm cannot be bound for such a debt, without an express assent for such purpose by all the partners.

III. And even where such express assent or promise is found, it is further necessary (as between the firm and its creditors) in order to make it binding, that the firm must have had the full consideration for such promise ; that is, it must have had the full benefit of the funds or goods for which they have promised to pay.

*March* 12.     THE VICE-CHANCELLOR.    The bill in this case does not allege an agreement or understanding in relation to the complainant's particular debt.    It only states generally, that the debts which Wilder had contracted in the copartnership business were agreed to be assumed.    Nor does Wilder say positively that he mentioned the name of the complainant or the debt due to the latter, as one of the number ; although he did mention the nature of the debts and how they had been contracted.

Both the bill and the answer of Oshea Wilder proceed upon the ground of all such debts being assumed as partnership debts, in consequence of the stock becoming joint property.    The defendant James M. Campbell, instead of meeting the assertion directly in form and substance, appears to have discriminated between an agreement to assume all and an agreement which would make himself liable for a particular debt of Mr. Colt's.    The latter he has denied ; although he has not negatived the former.    I do not understand him as contradicting directly and positively the allegations of the bill or the testimony of Wilder.    His averments and denials may be true, and yet Wilder's statement remain unimpaired and the credence due to him not essentially lessened.    In this point of view, the testimony is easily reconcileable.    Even Campbell admits that some of the debts which were contracted by Wilder on account of money borrowed and afterwards expended in the purchase of books, as well as the debt contracted by him with Sir Richard Philips for purchases on credit, were assumed by the partnership and either paid in cash or notes of the firm.

given for them. This seems to be in accordance with such an agreement as Wilder states to have been made ; and it corroborates his testimony as to the fact of an understanding to such effect when the partnership was formed. Nor do I discover any thing in the testimony of Robert Hill to disprove it. He was their clerk, for about six weeks after the commencement of the partnership, until its termination ; still, although during this time, he did not understand such an agreement had been made and (as far as he heard the declarations of Campbell and from other circumstances falling under his observation) the contrary would seem rather to appear from his evidence, yet the statement of Mr. Wilder may be strictly true. I yield my assent to this the more readily, because of the high character which this witness has given him for truth, integrity and fairness of conduct. I am thus bound to believe that, on entering into the partnership, it was an understanding and agreement between Wilder and Campbell that the debts of the former which had been contracted in and about the purchase of the property which he brought into the concern (including, of course, the complainant's debt to a certain extent) were to be considered as debts payable by the partnership or, in other words, out of the joint property.

This being the case, it appears to me there can be no valid objection in equity to the provision contained in the assignment, for the payment of such debts rateably, according to an ascertained amount, with other debts contracted in the course of the partnership business.

The assignment itself is not attempted to be invalidated, either in execution or sufficiency. Campbell acquiesces in it as an assignment duly executed for the benefit of partnership creditors. Mr. Anderson has become a party by executing it and accepting the trusts, so that he cannot be permitted to allege that the title of the property was not vested in him for the purposes specified in the assignment. Nor has any creditor attempted to impeach the instrument upon the ground of informality or want of authority in Wilder to make an effectual assignment of all the partnership property.

Under these circumstances, the question is: whether the complainant can be permitted to participate in the benefit of the assigned property as a creditor of the firm and to what amount, or, whether he is to be left to his remedy against Wilder solely?

My conclusion upon the evidence as to the fact of an understanding or agreement I have already stated. The consideration for such an agreement is the bringing in of the stock in the possession of one partner and making it joint property of the firm, as if it were by purchase, instead of crediting that partner with the amount as so much capital put in by him. It is, therefore, not like the case of one partner signing the partnership name to a note for his individual debt or undertaking to bind his copartner in relation to a transaction foreign to the partnership without his consent and by which the partnership is in no respect benefitted. The cases are evidently different. In the one, there is a mutual understanding and agreement that both shall be bound to the extent, at least, of the joint property; while, in the other, there is no such consent and, of course, no joint liability either in law or equity.

The cases in the books bearing the strongest analogy to the present are cases in bankruptcy. Under the peculiar operation of the English bankrupt system and for the purpose of avoiding confusion among the creditors in the distribution of the assets of a bankrupt partnership, the distinction between joint and individual debts and between creditors of the firm and creditors of any member of it in his individual capacity is carefully observed and always closely followed. And yet, some of these cases show very clearly that, under circumstances like the present, the debt would be regarded not an individual but a partnership one.

In *Ex parte Peele*, 6, *Ves.* 602., the question was, whether the debt, contracted with Sir Robert Peele by one of the partners individually, was afterwards assumed by them and became a joint debt? It was not disputed that, if an agreement to such effect was made between the partners in forming the partnership, it was sufficient; and Lord *Eldon* directed a reference to the commissioners to enquire whether, at the com-

mencement of the partnership, any debts due from one partner on account of his stock in trade were assumed and any debts due to him carried into the partnership with the knowledge and assent of the other partner. Thus showing how a prior individual debt may become a partnership debt, so far, at least, as to be proveable under a commission against the bankrupt partners jointly. A very little matter is sufficient to show the adoption of the debt by the other partners: *Ex parte Jackson*, 1. *Ves. Jr.* 131.

1832.

COLT
*v.*
WILDER.

The case of *Ex parte Bonbonus*, 8, *Ves.* 540, also contains a recognition of the doctrine, that a debt, originally a separate one, may be admitted as a joint debt, by showing the previous authority of the other partners to bind them or their subsequent approbation of it. And the case of *Ex parte Clowes*, 2, *Bro. C. C.* 595, is a direct authority to show that debts of some of the members of a partnership even upon bonds given by them separately, though for money's admitted by all the partners to have come to the use of the firm, may be proved as joint debts. The reason for it is this: the other partners consent and are privy to the application of the money to their joint use and agree among themselves to consider it a joint debt.

It is well settled, both in England and here, that a promise from one person to another for the benefit of a third will enable such third person to maintain an action upon such promise: *Schermerhorn* v. *Vanderheyden*, 1, *J. R.* 139; and equity follows the law in acting upon this principle.

There are some later cases in bankruptcy which, at first, may appear to be at variance in one particular with those above referred to. But, I think the earlier cases are entitled to the preference, as resting upon reason and justice. In *Ex parte Williams, Buck's Bank. R.* 13; a person, being in debt, entered into a partnership with another and brought in the stock in trade which he had on hand. In the deed of copartnership, it was agreed, that all the debts so due and owing by the one partner, as mentioned in a schedule annexed, should be paid by the partnership. The Lord *Chancellor* refused his assent to the doctrine that the separate creditors, by force of the deed

only and independent of any accession to the agreement on their part, could have maintained an action at law against the partners jointly immediately after the execution of the deed; and, therefore, would not, from that circumstance alone, consider them as creditors of the firm. His honor, however, admitted that a very little would do to make out an assent to the agreement; and he offered, if any creditors thought they could make out such a case, to give them liberty to apply on this ground to prove their debts against the joint estate. This case, then, does not decide that creditors may not avail themselves of the agreement between partners and turn the separate debt of one into the joint debt of both.

The next case is *Ex parte Freeman, Buck*, 471. There, upon the dissolution of a partnership, the retiring partner assigned all his interest in the partnership property to the continuing partner, who covenanted to pay the joint debts. A bankruptcy ensued. It was held, that as the joint creditors had not accepted the continuing partner as their sole debtor previous to the bankruptcy, they had not an election to prove against his separate estate. The Vice-Chancellor, before whom this case came, admitted, however, that if the creditors had acceded to the proposal before the bankruptcy, then a contract to such an effect would have been concluded and they could have come in as separate creditors of the continuing partner. The principle in this decision, it will be seen, is the same as in *Ex parte Williams*.

In the subsequent case of *Ex parte Fry*, 1 *Glyn* and *J.* 96, which was, in every respect, similar to *Ex parte Freeman*—the same Vice-Chancellor (Sir *John Leach*) refused to depart from the rule which he had there laid down. However, it is to be observed, that at the time of the hearing in the last case, his decision in *Ex parte Freeman* had been overruled on appeal, although without argument; and the Vice-Chancellor was induced to submit the question again, which he deemed important, to the consideration of the Lord *Chancellor*, by deciding as he had done in the former case.

The only point upon which these cases seem to turn and about

which there could be any difficulty, appears to be, whether the assent of the creditors to the arrangement between the partners was necessary before the bankruptcy, in order to give them the benefit of the change of debtors which such arrangements were intended to produce?

It does not appear, so far as my researches amongst subsequent cases have gone, how the question in the case last cited was finally disposed of nor that it has come up and been definitively settled in any other case.

I am at liberty, on this account, to regard it in some measure as an open question. At any rate, it is certain the decisions in the cases referred to have not established it as an invariable rule that creditors cannot claim in a court of equity the benefit of an agreement between partners in relation to the assumption and payment of pre-existing debts, where a bankruptcy or insolvency occurs to render a distribution of their property necessary, until they show some act of assent to the arrangement previous to the bankruptcy by which they have adopted the new debtors or varied or modified their legal rights in respect to the persons to whom they are to look for payment, Lord *Thurlow* in *Ex parte Clows*, and Lord *Eldon* in *Ex parte Peele*, acted upon no such rule and do not appear to have deemed it necessary. Under the authority of these two cases, I feel warranted in saying, it is not incumbent upon the complainant to show that, by any act on his part, he assented to the agreement of Wilder and Campbell, at the time of forming their partnership, to assume his debt and become his joint debtors. It is sufficient they did so agree between themselves and that an assignment has been made creating a trust for the benefit of the creditors of the firm. Among them, under the circumstances, the complainant may fairly be ranked.

Before I conclude, another case remains to be noticed, as it may be thought to have some bearing on the present. It is the case of *Bevan* v. *Lewis*, 1 *Sim.* 376. There, a partner borrowed money, with the privity and approbation, as was alleged, of his co-partner; and applied it to partnership purpos- This was known to the co-partner; although the individ-

ual who borrowed the money had given his own note for it, with a warrant of attorney as collateral security. By virtue of the latter, a judgment was entered up against him individually, a writ of *fieri facias* issued, and a levy made upon the partnership property. A bankruptcy having taken place, the question arose between the creditor and the assignees, whether the partnership interest in the goods was liable to be sold under the execution or only the individual interest of the defendant? In other words, whether it could be considered a partnership debt after what had thus taken place? The Vice Chancellor held, that the debt being in judgment upon securities, and which the creditor had thought proper to accept, it took its character from the securities and was, consequently, an individual and not a joint debt. But he expressed no opinion upon the effect of the transaction in borrowing the money, whether it would not have been a partnership debt; and as to which I think there could not have been a moment's hesitation, had not the note of one partner been taken and followed up by a warrant of attorney and judgment and execution against him individually; the very form and nature of which precluded all enquiry as to its being a partnership debt, especially when the question arose in relation to the effect of the levy made by the execution itself. The decision in this case is not in conflict with any of the principles I have drawn from those before cited. It rests upon an entirely different basis.

A decree must be entered, declaring the complainant a creditor of Wilder and Campbell at the time of their making the assignment to Mr. Anderson and entitled to dividends under it. The amount of his debt, however, must be first ascertained. The sum set opposite to his name in the schedule cannot be encreased, so as to enlarge the debt upon which dividends are to be declared; but I think it is liable to be reduced. The amount is to be limited to the value of the books, at cost, which were purchased with the complainant's money and actually brought into the joint stock. Wilder supposed it to be one thousand dollars; and he, accordingly, inserted this amount. Hill supposed there were about three hundred dol-

lars worth of such books in the store when he came there; but then again, sales, to a considerable amount, had been made after the partnership was formed and prior to his being employed. The amount is thus a subject of inquiry before a master, who can also ascertain the amount of dividends payable upon it.

I shall reserve all further directions until the coming in of the master's report.